ORIGINAL FILED

07 OCT 16 PM 12: 49

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MHP

FILED BY FAX
PURSUANT TO LOCAL RULES
WESTERN ATTORNEY, SERVICES

1  Lionel Z. Glancy # 134180
2  **GLANCY BINKOW & GOLDBERG**
   1801 Avenue of the Stars, Suite 311
3  Los Angeles, CA 90067
   Telephone: (310) 201-9150
4  Facsimile: (310) 201-9160
   Email: info@glancylaw.com
5
6  Arthur N. Abbey
   Nancy Kaboolian
7  Richard B. Margolies
   **ABBEY SPANIER ROOD**
8  **& ABRAMS, LLP**
   212 East 39th Street
9  New York, New York 10016
   Telephone: (212) 889-3700
10 Facsimile: (212) 684-5191
   Email: nkaboolian@abbeyspanier.com
11
12 Attorneys for Plaintiff Fredric Greenwald

C 07 5259

13 *[Additional counsel listed on signature page]*

14

15           **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 FREDRIC GREENWALD, individually and on behalf of all others similarly situated, | ) ) ) Civil Action No. |
| 18                                      Plaintiff, | ) ) ) **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS** |
| 19 vs. | ) ) |
| 20 XIAOFENG PENG, JACK LAI, and | ) ) |
| 21 LDK SOLAR CO., LTD. | ) ) |
| 22                                      Defendants. | ) **JURY TRIAL DEMANDED** |

23

24              **INTRODUCTION**

25      1.      Plaintiff, individually brings this class action on behalf of all other persons

26 similarly situated, (the "Class"), other than defendants and their affiliates, who purchased or

27 otherwise acquired American Depositary Shares ("ADS's") of LDK Solar Co., Ltd. ("LDK" or

28 the "Company") between August 1, 2007 through and including October 8, 2007 (the "Class

1

1  Period") for violations of the federal securities laws.  Plaintiffs seek to recover damages caused

2  to the Class by defendants' violation of Section 10(b) of the Securities Exchange Act of 1934

3  (the "Exchange Act").

4          2.      Plaintiff, Fredric Greenwald, by and through his attorneys, alleges the following

5  upon information and belief, except as to those allegations concerning Plaintiff, which are

6  alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among

7  other things, his counsel's investigation, which includes without limitation: (a) review and

8  analysis of filings made by LDK with the United States Securities and Exchange Commission

9  ("SEC"); (b) review and analysis of securities analysts' reports concerning LDK (c) review and

10  analysis of press releases and other publications disseminated by Defendants; and (d) review of

11  other publicly available information concerning LDK.

12                          **JURISDICTION AND VENUE**

13          3.      This Court has jurisdiction over the subject matter of this action pursuant to

14  Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15          4.      This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C.

16  §§78(j)(b) and 78(t), and the rules and regulations promulgated thereunder, including SEC Rule

17  10b-5, 17 C.F.R. 240.10b-5.

18          5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

19  U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud and/or its effects have

20  occurred within this District, and the Company maintains its principal executive offices in this

21  District. Many of the acts giving rise to the violations of law complained of herein occurred in

22  this District, including the preparation and dissemination of false press releases and false

23  financial statements filed with the SEC and reported to the financial media.

24          6.      In connection with the acts and omissions alleged in this Complaint, Defendants,

25  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

26  not limited to, the mails, interstate telephone communications, and the facilities of the national

27  securities markets.

28                          **PARTIES**
                                2

1     7.     Plaintiff, Fred Greenwald purchased 600 ADS's of LDK during the Class Period,

2    as set forth in the certification attached hereto.

3     8.     Defendant LDK is a corporation registered under the laws of the Cayman Islands.

4    The Company's United States office is located at 1290 Oakmead Parkway, Suite 306, Sunnyvale,

5    California and its Chinese headquarters is located at Hi-Tech Industrial Park, Xinyu City, Jiangxi

6    Province, 338032, People's Republic of China.  LDK, together with its wholly-owned

7    subsidiaries (including but not limited to LDK Solar USA, Inc.), is a leading manufacturer of

8    multicrystalline solar wafers.  Solar wafers are the principal raw material used to produce solar

9    cells which convert sunlight into electricity.  LDK sells multicrystalline wafers globally to

10   manufacturers of photovoltaic products, including solar cells and solar modules.  In addition, the

11   company provides wafer processing services to monocrystalline and multicrystalline solar cell

12   and module manufacturers.

13     9.     Defendant Xiaofeng Peng ("Peng") has been at all relevant times LDK's

14   Chairman and Chief Executive Officer. Mr. founded LDK in July 2005. He beneficially owns

15   approximately 72.0% of the Company's outstanding shares.

16     10.    Defendant Jack Lai ("Lai") has been at all relevant times LDK's Chief Financial

17   Officer.

18     11.    Defendants Peng and Lai, are sometimes referred to as the "Individual

19   Defendants."

20     12.    It is appropriate to treat the Individual Defendants as a group for pleading

21   purposes and to presume that the materially false and misleading information conveyed in

22   LDK's public filings, press releases and other group-published documents addressed herein

23   reflect the collective work of the Individual Defendants.  Each of the Individual Defendants, by

24   virtue of his or her position with the Company, was a corporate insider and directly participated

25   in the day-to-day operations and affairs of the Company at the highest levels and was privy to

26   confidential proprietary information regarding the Company and its business operations,

27   products, growth, financial statements and financial condition, as alleged herein.  During the

28

3

1    Class Period, the Individual Defendants were involved in the drafting, preparation, review and/or

2    dissemination of the Registration Statement/Prospectus, various public shareholder and investor

3    reports and other communications which contained the materially false and misleading

4    information alleged herein and were aware of, or recklessly disregarded, that materially false and

5    misleading statements were being issued regarding the Company, and approved or ratified these

6    

7    statements, in violation of the federal securities laws.

8           13.     During the Class Period, the Individual Defendants participated in preparing,

9    reviewing, approving and/or certifying consolidated financial statements for LDK that purported

10   to conform with applicable regulatory requirements and Generally Accepted Accounting

11   Principles ("GAAP"). These financial statements were filed with the SEC, and disseminated to

12   the public, through _inter alia_, the Registration Statement/Prospectus, Company press releases,

13   quarterly reports, and in other communications with investors, credit rating agencies, bank

14   lenders and securities analysts. The financial information contained therein misrepresented that

15   

16   LDK's financial statements were accurate.

17          14.     The Individual Defendants were aware of, or recklessly disregarded, the

18   misstatements contained in the Registration Statement/Prospectus, SEC filings, press releases

19   and other public statements complained of herein, and their materially false and misleading

20   nature. Because of their LDK Board membership and/or executive and managerial positions,

21   each of the Individual Defendants had access to the materially adverse undisclosed information

22   about LDK and its financial condition and performance as particularized herein, and knew or

23   recklessly disregarded that these adverse facts rendered the representations made by them or

24   LDK materially false and misleading.

25          15.     As officers and/or directors and controlling persons of a publicly held company

26   whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and

27   

28   

4

1    traded on the New York Stock Exchange, and governed by the provisions of the federal

2    securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and

3    truthful information with respect to the Company's financial condition and performance, growth,

4    operations, financial statements, business, products, markets, management, earnings and present

5    and future business prospects, and to correct any previously issued statements that were known

6    to have become materially false or misleading, so that the market price of the Company's

7    publicly traded securities would be based upon truthful and accurate information, but failed to do

8    so.

9

10    16.    The Individual Defendants, because of their positions of control and authority as

11    officers and/or directors of the Company, were able to and did control the content of the various

12    SEC filings, press releases and other public statements pertaining to the Company discussed

13    herein. Each Individual Defendant was provided with copies of the documents alleged herein to

14    be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

15    prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is

16    responsible for the accuracy of the Registration Statement/Prospectus, SEC filings, press releases

17    and other public statements detailed herein and is therefore liable for the representations

18    contained therein.

19    **CLASS ACTION ALLEGATIONS**

20    17.    Plaintiff brings this as a class action pursuant to Federal Rule of Civil Procedure

21    23(a) and (b)(3) on behalf of all persons who purchased LDK ADS's during the Class Period.

22    Excluded from the Class are Defendants, officers and directors of the Company, members of the

23    immediate families of the Individual Defendants and each of their legal representatives, heirs,

24    successors or assigns and any entity in which any Defendant has or has had a controlling interest.

25    18.    This action is properly maintainable as a class action because:

26    a.    The members of the proposed Class in this action are dispersed throughout

27    the United States and are so numerous that joinder of all Class members is impracticable. While

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1  the exact number of Class members is unknown to Plaintiff at this time and can only be

2  ascertained through appropriate discovery, Plaintiff believes that Class members number in the

3  thousands. Millions of LDK shares were traded publicly on the NYSE under the symbol "LDK".

4  The Company reported that 17.3 million ADS's were outstanding as of June 30, 2007;

5      b.    Plaintiff's claims are typical of those of all members of the Class because

6  all have been similarly affected by Defendants' actionable conduct in violation of federal

7  securities laws as alleged herein;

8      c.    Plaintiff will fairly and adequately protect the interests of the Class and

9  has retained counsel competent and experienced in class action litigation. Plaintiff has no

10  interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

11      d.    A class action is superior to other available methods for the fair and

12  efficient adjudication of the claims asserted herein because joinder of all members is

13  impracticable. Furthermore, because the damages suffered by individual members of the Class

14  may be relatively small, the expense and burden of individual litigation make it virtually

15  impossible for Class members to redress the wrongs done to them. The likelihood of individual

16  Class members prosecuting separate claims is remote;

17      e.    Plaintiff anticipates no unusual difficulties in the management of this

18  action as a class action; and

19      f.    the questions of law and fact common to the members of the Class

20  predominates over any questions affecting individual members of the Class.

21    Among the questions of law and fact common to the Class are:

22      i.    whether Defendants' acts and/or omissions as alleged herein

23  violated the federal securities laws;

24      ii.    whether statements made by Defendants to the investing public

25  during the Class Period and in the Registration Statement/Prospectus misrepresented an/or

26  omitted material facts about the financial condition of LDK;

27      iii.    whether the Company's Class Period public statements and filings

28  misrepresented and/or omitted material facts;

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

iv.    whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

v.    whether Defendants participated in and pursued the common course of conduct complained of herein;

vi.    whether the market price of LDK securities was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period; and

vii.    to what extent the members of the Class have sustained damages and the proper measure of damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

19.    The market for LDK's ADS's was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, LDK's ADS's traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired LDK ADS's relying upon the integrity of the market price of LDK's ADS's and market information relating to LDK, and have been damaged thereby.

20.    At all relevant times, the market for LDK's securities was an efficient market for the following reasons, among others:

(a)    LDK's ADS's met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, LDK filed periodic public reports with the SEC and the NYSE;

(c)    LDK regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

7

1       (d) LDK was followed by several securities analysts employed by major

2    brokerage firms who wrote reports, which were distributed to the sales force and certain

3    customers of their respective brokerage firms. Each of these reports was publicly available and

4    entered the public marketplace.

5       21. As a result of the foregoing, the market for LDK's ADS's promptly digested

6    current information regarding LDK from all publicly available sources and reflected such

7    information in LDK's stock price. Under these circumstances, all purchasers of LDK's

8    securities during the Class Period suffered similar injury through their purchase of LDK's

9    securities at artificially inflated prices and a presumption of reliance applies.

10           **THE FALSE AND MISLEADING STATEMNETS**

11       22. On May 31, 2007, LDK filed a registration statement on Form F-1 (the

12    "Registration Statement") and Prospectus (together the "Registration Statement/Prospectus")

13    with the SEC for a proposed initial public offering of 17,384,000 ADS's, representing

14    17,384,000 ordinary shares of the company (the "IPO").

15

16       23. That same day, on May 31, 2007, LDK issued a press release and announced its

17    IPO had been priced at US $27.00 per ADS and that the ADSs, each representing one ordinary

18    share of the company, would begin trading on June 1, 2007 on the New York Stock Exchange

19    under the symbol "LDK". In addition, LDK granted the Underwriters a 30-day option to

20    purchase up to an additional 2,607,600 ADSs to cover overallotments.

21       24. LDK's ADS's began trading on the NYSE on June 1, 2007.

22       25. The Registration Statement/Prospectus, represented the following about the

23    Company's business and operations:

24         We manufacture multicrystalline solar wafers, which are thin sheets
     of crystalline silicon material primarily made by slicing

25         multicrystalline ingots or monocrystalline boules. Solar wafers are
     the principal raw material used to produce solar cells, which are

26         devices capable of converting sunlight into electricity. We sell
     multicrystalline wafers globally to manufacturers of photovoltaic

27         products, including solar cells and solar modules. We produce and

28

8

sell multicrystalline solar wafers between 180 and 240 microns in thickness. In addition, we provide wafer processing services to monocrystalline and multicrystalline solar cell and module manufacturers.

We manufacture multicrystalline ingots from polysilicon feedstock in our directional solidification system furnaces, or DSS furnaces, as an interim step in producing wafers. In addition to using solar-grade virgin polysilicon, we also use other polysilicon materials from various sources in our ingot manufacturing process. We have developed proprietary production processes for the use of polysilicon scraps and recyclable polysilicon in manufacturing our ingots while maintaining our product quality and performance. We use substantially all of our ingots for production of our own wafers. In addition, we also sell polysilicon materials, which include ingots and polysilicon scraps.

As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 megawatts, or MW. We have entered into contracts to purchase additional equipment that is expected to be sufficient for our planned expansion to approximately 400 MW by the end of 2007 and approximately 600 MW by mid-2008. We intend to continue to increase our annual production capacity to approximately 800 MW by the end of 2008. However, we currently do not have contractual commitments for all the equipment necessary for the expansion of our production capacity beyond 600 MW.

Despite the current industry-wide shortage of polysilicon, we have inventory and commitments from suppliers that we believe will satisfy over 90% of our estimated requirements through the end of 2007 and approximately 50% of our estimated requirements for 2008. Many of our polysilicon supply agreements are subject to fluctuating market prices or price negotiations with our suppliers. The majority of our polysilicon feedstock consists of polysilicon scraps and recyclable polysilicon. In addition to polysilicon scraps and recyclable polysilicon, we also use virgin polysilicon for our polysilicon feedstock. We have purchased polysilicon scraps and recyclable polysilicon from semiconductor materials trading companies, including Komex Inc., or Komex, Kunical International Group Ltd., or Kunical, and Prime GLP Inc., or Prime. We have also purchased virgin polysilicon from virgin polysilicon manufacturers. In addition, some of our major customers, including Canadian Solar Inc., or CSI, and Q-Cells AG, or Q-Cells, have supplied us with polysilicon feedstock. We also source polysilicon feedstock from the spot market from time to time depending on the price and our requirements.

9

26.    The Registration Statement/Prospectus was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading because as detailed below, Defendants concealed the full extent of its improper inventory control procedures and that it the Company was inaccurately reporting its inventory.

27.    On August 1, 2007, LDK filed a Form 6-K with the SEC that incorporated the Company's unaudited financial results for the second quarter ended June 30, 2007. Defendant Lai signed the Form 6-K.

28.    On August 1, 2007, LDK issued a press release that incorporated the Company's unaudited financial results for the second quarter ended June 30, 2007. The press release reported, as follows:

All financial results are reported on a U.S. GAAP basis.

Second Quarter 2007 Financial Highlights:
- Revenue of $99.1 million, up 716% from the year ago quarter
- Gross profit of $34.9 million, up 1,265% from the year ago quarter
- Net income of $28.7 million, or $0.29 per diluted ADS, up 2,083% from the year ago quarter
- Increased annualized multicrystalline wafer production capacity from 215 MW to 300 MW, up 40% quarter-over-quarter

Net sales for the second quarter of fiscal 2007 were $99.1 million, up 35% sequentially from $73.4 million for the first quarter of fiscal 2007, and up 716% year-over-year from $12.1 million for the second quarter of fiscal 2006.

Gross profit for the second quarter of fiscal 2007 was $34.9 million, up 23% sequentially from $28.4 million for the first quarter of fiscal 2007, and up 1,265% year-over-year from $2.6 million for the second quarter of fiscal 2006. Gross margin for the second quarter of fiscal 2007 was 35.2%, compared with 38.7% in the first quarter of fiscal 2007 and 21.0% in the second quarter of fiscal 2006.

10

Net income for the second quarter of fiscal 2007 was $28.7 million, or $0.29 per diluted ADS, compared to net income of $24.5 million, or $0.27 per diluted ADS for the first quarter of fiscal 2007, and $1.3 million, or $0.02 per diluted ADS for the second quarter of fiscal 2006.

The Company ended the second quarter of fiscal 2007 with $250.6 million in cash and cash equivalents.

"We are pleased to report strong results for the second quarter, our first as a public company," stated Xiaofeng Peng, Chairman and CEO of LDK Solar. "Our results demonstrate our success in providing our customers, leading global solar cell and module manufacturers, with high-quality multicrystalline solar wafers at significant cost advantages. During the quarter, we executed our growth strategy on plan and continued the rapid expansion of our production capacity. In addition to ramping our production lines, we continued to make progress on our cost reduction efforts through further advancements of our production processes.

"We recently ordered additional DSS furnaces and wire saws to further expand our manufacturing capacity to 1,600 MW by the end of 2009. We also announced the purchase of polysilicon production equipment, enabling LDK to produce virgin silicon feedstock. By augmenting our strategy upstream, we believe we will enhance our cost efficiencies," concluded Mr. Peng.

***

For the third quarter of fiscal 2007, LDK estimates revenue is expected to be in the range of $115 to $125 million and fully diluted earnings per ADS of $0.29 to $0.32.

29.     The Company also held an Earnings Conference Call on August 1, 2007 to discuss the second quarter results. During the call, Defendant Lai stated in relevant part, "Inventories increased from $140 million at the end of the first quarter to $174 million at the end of the second quarter, as we accumulated additional silicon-free stock."

30.     On September 18, 2007, LDK published an investor presentation that contained the Company's balance sheet information. The balance sheet highlighted the Company's growth in inventories ($174 million) as of June 30, 2007 compared to $114.2 million in the previous quarter.

11

31.     On information and belief, on September 25, 2007, LDK's financial controller, Charlie Situ, sent a series of e-mails to regulators, auditors and investment bankers saying that he had quit LDK because his bosses refused to write off bad inventory.

32.     On October 3, 2007, Reuters reported that one of LDK's financial controllers had departed the Company after making allegations about LDK's poor controls and inventory discrepancies. The Reuters article stated, in relevant part:

> In an analyst research note, Piper Jaffray said it had confirmed that LDK's financial controller had recently left the company. "We are also aware of the former controller's allegations of poor financial controls and a 250-tonne inventory discrepancy. "News of the departure may pressure the stock short term," the note said.

> Piper Jaffray said the allegations were made to both the Securities and Exchange Commission and the external auditor KPMG. It said it has spoken to LDK's chief financial officer who assured Piper of its 1,000-tonne inventory of polysilicon, an essential raw material in the production of solar cells for panels that convert sunlight to electricity.

On this news, the Company's stock closed down $16.66, or 24.39 percent, at $51.65 and fell further, to $47.49, in after-hours trading.

33.     The next day, on October 4, 2007, LDK issued a press release and defended its bookkeeping. The Company announced that a management team took a physical inventory of LDK's polysilicon feedstocks and found no accounting discrepancies. The press release stated:

> A few days ago, a former financial staff member of LDK, Charley Situ, who was terminated for cause on September 25, 2007, sent email letters to LDK's management and others subsequent to his termination alleging inconsistencies in LDK's inventory reporting. Mr. Situ was originally hired as a Financial Controller in March, 2007, reporting to Qiqiang Yao, LDK's Vice President and Chief Accounting Officer, who reports to Jack Lai, Executive Vice President and Chief Financial Officer. In response to the allegations and in accordance with instructions of the board of directors, LDK's management team and board of directors formed an internal committee to investigate the allegations and conduct an immediate physical inventory of LDK's polysilicon materials. The management team found no material discrepancies as compared to LDK's financial statements. The management team believes that

12

1  these allegations have no merit. Additionally, the Audit Committee
   has asked an independent auditing firm to conduct a separate,
2  independent engagement on LDK's inventory. These findings are
   expected to be disclosed after the completion of the review and
3  consideration of the Audit Committee. LDK has not been
   contacted by any regulatory authority regarding this matter."
4

5      34.     On October 8, 2007, Barron's published an article entitled "China Solar Boom

6  Loses Its Luster," and reported that LDK may be overstating earnings and the value of its

7  inventories.   According to Barron's senior editor Bill Alpert, after talking to someone with

8  knowledge of LDK's manufacturing, that person said that LDK's silicon ingots were so impure

9  that they were too contaminated for technicians even to analyze with instruments. The Barron's

10 article detailed LDK's manufacturing problems and the unreliability of the Company's internal

11

12 information:

13     So firms like LDK...have developed recipes that use large portions
       of recycled silicon. LDK has more than 3,000 workers sorting and
14     testing scrap the company obtains from broken wafers,
       semiconductor rejects and ingot sawdust. LDK brags that its secret
15     recipe lets it make wafers with as little as 25% virgin polysilicon.
       Since silicon accounts for 75% of LDK's cost-of-goods-sold, the
16     potential savings are a big deal.

17     And LDK's industry-leading profit margin of 29% would seem to
18     validate the savings from the company's scrap recipe. But those
       savings may be a mirage, according to the allegations of ex-
19     controller Situ and a person familiar with LDK's manufacturing.
       Via a translator, Barron's learned that LDK's furnaces are often
20     short of usable feedstock, even though the company's piles of
       silicon scrap keep growing. The factory's internal information is
21     unreliable, with one record reportedly indicating that LDK's
22     wafer-cutting saws had an impossible yield of 140%. Industry
       experts say that most wafer-cutting enterprises break even at 90%
23     usable yields. Instead, according to the person knowledgeable
       about the manufacturing, LDK's wafering operation has yields that
24     actually range from 55% to 70%. The company won't comment on
25     its yields.

26     Low yields from LDK's production may stem from its practice of
27     buying just about any scrap that has silicon in it, says this same
       person. Several months back, the company's furnaces produced a
28     batch of several dozen 270-kilo ingots so motley that testing

                                    13

1    instruments couldn't even tell whether the resulting silicon was
2    positively or negatively charged. The virgin-silicon supplier
     MEMC was so alarmed at the quality of wafers produced by LDK,
3    says the source, that it stationed its own quality-control monitor at
     the LDK factory in China's Jiangxi province.
4

5    35.    The October 8, 2007 Barron's article also reported that LDK's inventories may be
6    overvalued by as much as $92 million:

7        In his resignation letter, Situ said that LDK's inventories might be
8        *overvalued by $46 million to $92 million, which is more than the*
         *company reported in profits before its May 31 initial offering in*
9        *the U.S.* E-mail discussions that started before the May IPO
         showed Situ trying to get colleagues to reconcile discrepancies
10       between LDK's accounting ledger and its warehouse ledger. *A*
11       *spreadsheet circulated by Situ showed that by the end of August,*
         *LDK warehouse records listed about $54 million worth of silicon*
12       *feedstock, but accounting records showed $100 million.*

13       Through August, according to Situ's spreadsheet, LDK sank about
14       $119 million of cash into inventory.

15       Situ's internal campaign ended on Sept. 13, when financial chief
         Lai held a conference call with him and other accounting staff.
16       Situ argued that LDK should take a charge for its unusable silicon
         scrap. In a subsequent statement, Situ says the conference ended
17       when he was overruled by the company's chief accounting officer,
18       Qiqiang Yao. The ruling: Silicon scrap that was not usable today
         might someday become usable with the new processing
19       techniques.

20                            ***
         Situ says he quit after that decision, not wanting to be party to
21       what he considers a stock fraud.

22   (Emphasis added).

23   36.    On October 8, 2007, CNN Money reported that "Chief Financial Officer Jack Lai
24   said that in a matter of days, the company likely would file a report with the Securities and
25   Exchange Commission and publish information reconciling data from a management assessment
26   that [was] collected by its independent auditing firm on its inventory of polysilicon, the raw
27   material for solar-cell manufacturing." The CNN Money article further reported, that Mr. Lai
28
                                              14

1    was "interviewed by Clean Technology Investor on October 5, 2007, via telephone at his office

2    in Sunnyvale, California and Lai said he was about to fly to China, where he expected to arrive

3    Sunday evening and focus on "getting this matter resolved." He said neither the SEC nor any

4    other regulatory bodies have contacted the company. Lai said LDK expects to meet all of its

5    revenue, production and delivery targets regardless of the allegations about its inventories. For

6

7    its third quarter ended Sept. 30, LDK estimated revenue of between $115 million and $125

8    million."

9        37.    The Company's ADS's which had traded as high as $76.75 on September 27,

10   2007, sank $13.45 on October 8, 2007, or 26 percent, to close at $37.50.

11       38.    On October 9, 2007, LDK issued a press release entitled "LDK Solar Comments

12   on Recent Events and Updates Q307 Revenue Guidance to Between $140 to $150 Million" and

13   stated the following:

14

15               On October 4, 2007, LDK Solar issued a statement refuting certain
                 allegations made by a former employee who was terminated for
16               cause regarding its inventory reporting after LDK's management
                 conducted an internal investigation and physical inventory counts
17               and found no material discrepancies as compared to LDK's
                 published financial statements. In addition, LDK's Audit
18               Committee is in the process of conducting a review of the inventory
                 and will disclose its findings to the public in due course. LDK's
19               management team continues to believe that the allegations made by
                 a disgruntled, former employee have no merit.
20

21               LDK Solar would like to clarify certain misperceptions that have
                 recently been circulated.
22

23                 •  LDK management stands by its internal review of the
                       inventory and does not believe there are any material
24                     inconsistencies with what LDK has disclosed in its financial
                       statements.
25

26                 •  LDK uses both virgin and recyclable polysilicon for ingot
                       production. LDK's ability to use recycled silicon in the
27                     manufacturing process is a key strength of the company in
                       its efforts to enhance its cost structure. LDK consistently
28

accounts for its various grades of recycled polysilicon used
in its production process.

- LDK's inventory is subject to periodic review and
  examination by both internal and external working parties,
  including LDK's independent auditors, in connection with
  the preparation by LDK of its quarterly financial statements
  and, to date, they have not found any material
  inconsistencies.

- LDK's OEM business consistently uses polysilicon
  feedstock consigned by its customers; such feedstock does
  not mix with LDK's own inventory. There have not been
  any customers sending on-site quality inspectors to LDK
  Solar plants to question the quality of the shipped wafers.

- LDK has continued its wafer production, shipment to
  customers and capacity expansion as planned.

Based on preliminary management reports, LDK exceeded its
original plan and shipped approximately 75 MW of wafers in the
third fiscal quarter ended September 30, 2007. As a result, LDK
hereby updates its Q307 revenue guidance from $115 to $125
million to $140 to $150 million.

Defendant Peng commented on the Company's inventory accounting practices and stated:

As we previously indicated, we believe that there is no merit in the
allegations made about our inventory accounting practices, our
business operations are normal and we continue making shipments
to fulfill our customers' orders. We remain confident that we have
the appropriate financial controls and procedures in place for
inventory reporting, and look forward to putting this unfortunate
matter behind us.

39.     On October 9, 2007, <u>Greentech Media</u> reported that the Company's inventory
includes unusable materials. The article stated in relevant part:

As LDK Solar faces allegations of inconsistencies in its silicon
inventory, the company said it counts among its inventory materials
that critics say are unusable. In an invitation-only conference-call
on Thursday, a recording of which was obtained by Greentech
Media, LDK Chief Financial Officer Jack Lai said the company
includes wire-saw slurry and so-called off-spec broken wafers in its
silicon inventory.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

But while he said wire-saw slurry - the sawdust produced when silicon is cut - is not booked in the inventory until it is processed into a usable form, Lai said that off-spec broken wafers - broken pieces of wafers that didn't meet performance specifications - are recorded as part of the inventory right away.

Analysts say these off-spec broken wafers can't yet be refined into usable silicon without great expense.

"When [wafers] are purchased, they will be booked as inventory and they will be processed to check the ... receptivity and to prepare to be ready for production usage," Lai said. Lai didn't say how much of the inventory is made up of off-spec broken wafers and the company didn't respond to calls asking for clarification by press time.

A Piper Jaffray report last week included allegations by Charley Situ, a former financial controller at LDK, of inconsistencies in the company's inventory of solar-grade silicon.

***

Shareholders care about the company's silicon inventory because - with a worldwide shortage of solar-grade silicon - sales, margins and profits all directly relate to the amount of silicon a company is able to obtain and the price it must pay to get it.

LDK claims it pays less for silicon than some of its competitors because only 10 to 25 percent of its silicon is so-called "virgin" silicon, or the unused, high-grade silicon favored by most solar manufacturers. The company says it buys used silicon for less and recycles it, processing it into a usable form.

But the allegations raise questions about whether LDK's future margins will be as lucrative as expected.

During the conference call, Lai said he didn't know how Situ got his numbers and repeated that the inventory matches LDK's ledger. "In my personal opinion, he has many, many misperceptions about the inventory," Lai said. "My understanding is that he does not understand the different grades of silicon material we have in the warehouse. "And if you are not familiar yet, the LDK business model is to use mostly recyclable materials rather than virgin silicon. ... I think he misunderstood the definition of polysilicon material in LDK." Aside from the different types of silicon in LDK's warehouse, another potential misunderstanding by Situ might be related to silicon being transported to the warehouse, Lai said. LDK books silicon in its inventory once it pays for the

17

material, even though it isn't physically in the warehouse yet, Lai said. He compared it to buying something from a department store and having left the store, but not having brought it home yet. Once the company assumes the title - and the liability - the silicon is LDK's property and can be included in the books appropriately, he said. About one-fifth of the company's silicon is in transit, Lai said.

Do Off-Spec Wafers Count?

Analysts said the main question is whether LDK is justified in counting in its inventory silicon that it might not be able to use yet, but that it expects to be able to use one day.

Michael Rogol, managing director of Photon Consulting, said LDK - along with competitor ReneSola - have been particularly successful in removing impurities so far. "This issue is complex because LDK is very good at using silicon that other companies often can't use," he said. "What one company would call waste silicon and write off, LDK is sometimes able to turn into solar wafers. ... That makes it harder to account for the silicon."

But Paula Mints, principal solar analyst at Navigant Consulting, called the practice of including off-spec broken wafers "highly questionable." She said it is "highly unlikely" off-spec broken wafers will be usable without undergoing a "very expensive purifying process that probably wouldn't be worth doing." While Mints said she isn't familiar with inventory rules in China, she said it is typical for U.S. and European companies to write off any off-spec equipment, raw material or product right away.

Mark Cox, CEO of New Energy Fund, said it's clear the stock market doesn't believe the company is being disciplined enough in looking after its silicon. The company should consider the amount of money it will cost to purify any lower-quality silicon and find a way to include that cost in its inventory accounting, he said.

Travis Bradford, president of the Prometheus Institute, said the real issue is whether LDK bought material it can't use. "If so, they need to take the earnings hit and write down their inventory," he said. "The point is that they may have done that because they wanted to show they were more profitable than they were, or they might have done that because they believe the inventory is still usable." His advice to LDK would be to err of the conservative side, removing any questionable inventory from its books until it becomes usable. But he added the company has been "reasonably forthcoming" about the issue and most companies include "nonvirgin" silicon (read: used silicon) in their inventories. The stock reaction has less

18

1
2
3
4

to do with the quality of LDK's silicon inventory and more to do with general market perception that solar stocks and Chinese stocks are in a frenzy, Bradford said. "At this point, it's commonly believed that the investment in these stocks is in a bubble mentality, but nobody knows when that bubble's going to burst, and so small anxieties become panics," he said.

5

Wider Implications

6
7
8
9
10
11
12
13
14

The company's troubles could have wider implications for the industry, including the potential for an even tighter silicon shortage than expected and the possibility of more detailed disclosures about silicon inventories in the future, analysts said. Mints said the situation shows that people need to be "more suspicious" about company's claims. "There are a lot of issues of poor quality wafers and cells coming out of China," she said. "It isn't a surprise to anyone in the industry - although the scale [of this situation] is. ... It's an indication that more research needs to be done on every company, but - unfortunately - especially on the companies in China." A number of industry forecasts are based on the idea that there will be a "huge glut" of product coming from China, Mints said. If the LDK situation is an indication that glut might not arrive, it means those forecasts will need to be revised, she said.

15
16
17

Cox said investors and analysts are definitely going to have more questions about other companies' silicon inventories now. "This is going to go through the entire industry," he said. "People are going to want to find out how everybody manages their silicon inventories."

18
19
20
21
22
23
24
25
26

Even if LDK's accounting turns out to be common practice, it highlights a lack of clearly defined standards for accounting of all the different types of silicon used in the solar industry. As in the oil industry, where companies have to figure out how much of their stockpiles are "recoverable reserves," silicon accounting isn't cut and dried, Bradford said. "Accounting questions are never clear," he said. "It all comes down to perception and accountability, based on a valuation. The assumption is the inventory is worth at least what you paid for it. If you discover it's worth less than what you paid for it, you have to take a write-down." If the issue proves to be more widespread than just LDK and relevant to the industry, Bradford said companies could well be asked to separate out different types of silicon in their reporting. But if the silicon shortage ends and more virgin silicon becomes available, the issue might not be large enough to matter, he said.

27
28

Toward the end of the call, Lai said that after the independent audit is complete, the audit committee will review it along with the

19

1   results from LDK's internal investigation and form a conclusion.
2   Then, the company's lawyer will draft a report to file with the U.S.
    Securities and Exchange Commission. With so much at stake, you
3   can be sure investors - along with the industry as a whole - will
    await the independent audit with bated breath.
4

5      40.   Defendants statements throughout the Class Period, including the statements
6   made in the Registration Statement/Prospectus, were false and misleading because:

7          (a)   Defendants overstated LDK's inventory of polysilicon prior to and during
8   the Class Period;

9          (b)   The Company failed to disclose that it maintained poor financial controls
10  and procedures; and

11         (c)   LDK's solar wafer production yields were far below the company's
12  reported levels and the industry's norms.

13                      **COUNT I**
            **Violation of Section 10(b) of the Exchange Act and**
14          **Rule 10b-5 of the Securities and Exchange Commission**
                      **(Against All Defendants)**
15

16     41.   Plaintiff repeats and realleges each and every allegation contained in the
17  foregoing paragraphs as if fully set forth herein.

18     42.   This Count is asserted against all Defendants and is based upon Section 10(b) of
19  the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

20     43.   During the Class Period, Defendants directly engaged in a common plan, scheme,
21  and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts,
22  practices, and courses of business which operated as a fraud and deceit upon plaintiffs and the
23  other members of the Class, and made various deceptive and untrue statements of material facts
24  necessary in order to make the statements made, in light of the circumstances under which they
25  were made, not misleading to plaintiffs and the other members of the Class. The purpose and
26  effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce
27  plaintiffs and the other members of the Class to purchase or otherwise acquire LDK ADS during
28  the Class Period at artificially inflated prices.

                                20

1    44.    During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful
2    course of conduct, knowingly and recklessly issued, caused to be issued, participated in the
3    issuance of, the preparation and issuance of deceptive and materially false and misleading
4    statements to the investing public as particularized above.

5    45.    As a result of the dissemination of the false and misleading statements set forth
6    above, the market price of LDK securities were artificially inflated during the Class Period.  In
7    ignorance of the false and misleading nature of the statements described above and the deceptive
8    and manipulative devices and contrivances employed by said defendants, plaintiff and the other
9    members of the Class relied, to their detriment, on the integrity of the market price of the stock in
10   purchasing or otherwise acquiring LDK ADS's.  Had plaintiff and the other members of the
11   Class known the truth, they would not have purchased or otherwise acquired said ADS's or
12   would not have acquired them at the inflated prices that were paid.

13   46.    Plaintiff and the other members of the Class have suffered substantial damages as
14   a result of the wrongs herein alleged in an amount to be proved at trial.

15   47.    By reason of the foregoing, defendants directly violated Section 10(b) of the
16   Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes,
17   and artifices to defraud; (b) made untrue statements of material facts or omitted to state material
18   facts necessary in order to make the statements made, in light of the circumstances under which
19   they were made, not misleading; or (c) engaged in acts, practices, and a course of business which
20   operated as a fraud and deceit upon plaintiffs and the other members of the Class in connection
21   with their acquisitions of LDK ADS's during the Class Period.

22                                    **COUNT II**
                    **For Violation of Section 20(a) of the Exchange Act**
23                        **(Against the Individual Defendants)**

24   48.    Plaintiff repeats and realleges each and every allegation contained above as if
25   fully set forth herein.

26   49.    The Individual Defendants acted as controlling persons of the Company within
27   the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

28
                                       21

1 │ positions, participation in and/or awareness of the Company's operations, and/or intimate

2 │ knowledge of the Company's products, sales, accounting, plans and implementation thereof, they

3 │ had the power to influence and control and did influence and control, directly or indirectly, the

4 │ decision-making of the Company, including the content and dissemination of the various

5 │ statements that plaintiffs contend are false and misleading. The Individual Defendants were

6 │ provided with or had unlimited access to copies of the Company's reports, press releases, public

7 │ filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after

8 │ these statements were issued and had the ability to prevent the issuance of the statements or

9 │ cause the statements to be corrected.

10 │      50.    The Individual Defendants had direct and supervisory involvement in the day-to-

11 │ day operations of the Company and, therefore, are presumed to have had the power to control or

12 │ influence the particular statements giving rise to the securities violations as alleged herein, and

13 │ exercised the same.

14 │      51.    By virtue of their positions as controlling persons, Individual Defendants are

15 │ liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the

16 │ wrongful conduct, plaintiff and other members of the Class suffered damages in connection with

17 │ their purchases or acquisitions of the Company's securities during the Class Period.

18 │ **NO SAFE HARBOR**

19 │      52.    The statutory safe harbor provided for forward-looking statements under certain

20 │ circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

21 │ The statements alleged to be false and misleading herein all relate to then-existing facts and

22 │ conditions. In addition, to the extent certain of the statements alleged to be false may be

23 │ characterized as forward looking, they were not identified as "forward-looking statements" when

24 │ made, there was no statement made with respect to any of those representations forming the basis

25 │ of this Complaint that actual results "could differ materially from those projected," and there

26 │ were no meaningful cautionary statements identifying important factors that could cause actual

27 │ results to differ materially from those in the purportedly forward-looking statements. In the

28 │ alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking

1  statements pleaded herein, Defendants are liable for those false forward-looking statements

2  because at the time each of those forward-looking statements was made, the speaker had actual

3  knowledge that the forward-looking statement was materially false or misleading, and/or the

4  forward-looking statement was authorized or approved by an executive officer of LDK who

5  knew that the statement was false when made.

6                              **PRAYER FOR RELIEF**

7        **WHEREFORE**, Plaintiff, on behalf of himself and all other Class members, prays for

8  judgment as follows:

9        A.    A determination that this action is a proper class action and a certification of the

10  Class under Rule 23 of the Federal Rules of Civil Procedure;

11        B.    An award of compensatory damages in favor of Plaintiff and the other Class

12  members against all Defendants for damages sustained as a result of Defendants' wrongdoing,

13  including interest thereon;

14        C.    An award to Plaintiff and the Class of their reasonable costs and expenses

15  incurred in this action, including counsel fees, expert fees and other disbursements; and

16        D.    A grant of such other relief as the Court may deem just and proper.

17                              **JURY DEMAND**

18        Plaintiff demands a trial by jury.

19  Dated: October 12, 2007              By:_____

20                                          **LIONEL GLANCY** #134180

21                                       **GLANCY BINKOW & GOLDBERG LLP**
                                         1801 Avenue of the Stars, Suite 311
22                                       Los Angeles, CA 90067
                                         Telephone:  ( 310) 201-9150
23                                       Facsimile:   (310) 201-9160
                                         Email: info@glancylaw.com
24
25                                       Susan G. Kupfer # 141724
                                         **GLANCY BINKOW & GOLDBERG LLP**
26                                       One Embarcadero Center, Suite 760
                                         San Francisco, California 94115
27                                       Telephone: (415) 972-8160, ext:225
                                         Facsimile: (415) 972-8166
28
                                              23

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ABBEY SPANIER ROOD
    & ABRAMS, LLP**
Arthur N. Abbey
Nancy Kaboolian
Richard B. Margolies
212 East 39th Street
New York, New York 10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

Attorneys for Plaintiff

CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

**CERTIFICATION OF LEAD PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I _____, declare as follows:

1.  I have reviewed a copy of the complaint filed in this action.

2.  I did not purchase the security that is the subject of this action [LDK Solar, Co., LTD (LDK)] at the direction of counsel, Abbey Spanier Rodd & Abrams, LLP, or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase/Sale) | Quantity | Trade Date | Price Per Share/ Security |
|---|---|---|---|---|
| LDK Solar | Purchase | 600 | 9/27/07 | 74.60 / 44.934 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*List additional transactions on a separate sheet of paper, if necessary.  If the securities were purchased by joint owners, please provide the above information for the co-owner.

5.  I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/10/07          Signed: _Fredric Greenwald_

Print Name: _FREDRIC GREENWALD_